THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JANICE BYER, Defendant-Appellant.

First District (4th Division)   No. 78-368

Opinion filed August 23, 1979.

James J. Doherty, Public Defender, of Chicago (Andrea Lyon, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, and Mary Ellen Dienes, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, the defendant, Janice Byer, was found guilty of murder and robbery and was sentenced to a term of 21 to 30 years in prison. On appeal, the defendant argues she was denied a fair trial because (1) cross-examination of the State's witnesses was restricted and the court refused the admission of impeaching evidence; (2) the trial court refused to ask the venire about

their attitude concerning the affirmative defense of compulsion; (3) the testimony of a witness at the suppression hearing was excluded; and (4) the State asked the defendant an allegedly improper and prejudicial question. Additionally, the defendant argues she was not proved guilty of murder and robbery beyond a reasonable doubt. She also contends that the trial court erred in sentencing her to 21 to 30 years on the robbery conviction; she contends the court should have allowed her to present two jurors in mitigation at her sentencing hearing; and, finally, the defendant argues that her sentence is excessive.

The defendant concedes her involvement in the crimes charged and presents an affirmative defense of compulsion.

Before trial a hearing was held on the defendant's motion to suppress her oral and written statements which were given at the time of her arrest. On appeal, the only issue relating to the suppression hearing concerns the court's restrictions on the scope of Stella McCormick's testimony. The defendant argues McCormick's treatment by the police during questioning was similar to the treatment she received and would have corroborated her claim of coercion. Only the hearing testimony pertinent to this issue will be related here.

Police officers Donnersberger and Lawrence each testified that the defendant was advised of her *Miranda* rights and that she was not threatened and was not given any promises. During McCormick's testimony defense counsel made an offer of proof that if McCormick were allowed to testify she would say that when she came to the station she was told she would be charged with murder unless she cooperated with the police. She was also told that her children would be taken away from her; she said she was not advised of her constitutional rights before giving a statement.

The defendant testified that she was not informed of her rights until after many hours of questioning; that she was handcuffed to the wall and threatened by the police; that she was told she would not see her children for a long time; and that the police said she would receive a one year sentence and five years probation for her part in the crime. The court denied the defendant's motion to suppress her statements.

Prior to the questioning of the venire, defense counsel submitted certain questions to the trial court and asked that those questions be asked of the prospective jurors. The request was denied. One of the tendered questions concerned the jurors' attitude to the affirmative defense of compulsion: "Do you feel that a mother, to protect herself and her children, from being hurt might involve herself in a crime, and even be willing to go to jail to protect herself and her children?" The court did not ask the prospective jurors any questions about the affirmative defense.

At trial Chicago Police Officer Robert Eggert, Jr., testified that on

August 1, 1976, at approximately 10:40 p.m., he went to 937 West Cornelia in the City of Chicago in response to a radio call. When he and his partner arrived at the building they were led to apartment 108. They found the door to the apartment slightly ajar, and when Eggert pushed it open he observed that the room was in total disarray. A man was lying on the floor with his face in a pillow. The man was dead. The defendant, who had made the call to the police, told Eggert that she noticed the door to the apartment ajar and thought it unusual. She said she went into the apartment and discovered the victim face down with a towel tied around his face and a chair over him. She called the police.

Dr. Eupil Choi, a pathologist with the Cook County Medical Examiner's Office, testified that he performed an autopsy on the victim. Dr. Choi gave his opinion that the cause of death was cardiac arrest with associated asphyxia.

Investigator Joseph Stachula testified that he talked to the defendant on August 1. She told him basically the same story as told to Eggert concerning her discovery of the body. She also told him that on the afternoon of July 31 she saw a young woman enter the foyer of the building and check the mailboxes. The defendant asked the woman if she could help her and the woman asked to be directed to apartment 108. The woman said she was looking for Nicholas Orga, the victim, in response to the defendant's question.

McCormick, the common-law wife of Charles Colley, testified that on the afternoon of July 31, 1976, she was in her father-in-law's apartment at 937 West Cornelia, along with the defendant, Charles and Kenneth Colley, and their father William Colley. The defendant suggested to the two Colley brothers that the three of them rob the victim, Nicholas Orga. The defendant mentioned that Orga would be getting a Social Security check and that it would be easy to take it from him. About 5:30 p.m. McCormick left the apartment with her husband, Charles Colley. McCormick and Charles Colley later returned to William Colley's apartment. The defendant was still in the apartment with Kenneth and William Colley. Jeanette Bunch, Kenneth Colley's common-law wife, Robin Rowe, and Sherry, Rowe's girlfriend, were also present. The conversation concerned robbing Orga. Bunch mentioned that she had some pills which could be used as knock-out drops. Bunch located the container of pills, added water, shook it up, and gave the pills to the defendant. Bunch told the defendant that a heart attack could occur if too large a dose was given to someone. The defendant and Sherry took the drug and went to the victim's apartment. Sherry, who posed as a prostitute, was unable to get into the victim's apartment.

The defendant then went alone to the victim's apartment. When she returned in about 20 minutes she informed the brothers that "he is almost

out." Kenneth Colley then left the apartment and returned 15 minutes later to get his brother Charles. After the Colley brothers left the apartment, the defendant went out and returned with a blue suede coat, some groceries, and a bottle of whiskey. The defendant stated that the whole thing was very easy.

McCormick stated that everyone in the apartment was drinking beer that afternoon and everyone but the defendant was taking preludins or speed. She testified that she never heard anyone threaten either the defendant or her children. McCormick had no knowledge of any grudge which Kenneth Colley had against the victim. She also testified that approximately three weeks prior to the robbery, a conversation took place between the defendant and Charles and Kenneth Colley. No one was drinking on that day and no one was taking drugs. The defendant told the Colley brothers that Orga would soon be getting some Social Security checks and suggested that they rob him. Charles and Kenneth Colley stated that they wanted no part in any robbery.

McCormick acknowledged that she did not tell the police about the incident until August 19, 1976, when she was brought to the police station for questioning. She was told by the police that she would be held in custody until her husband, Charles Colley, turned himself in. Epplen did not threaten to charge her with murder if she did not cooperate; nor did he tell McCormick that her children would be taken away unless she gave a statement. McCormick also testified that she was not told that the Colley brothers would get a lighter sentence if she testified against the defendant.

Robin Rowe, the Colley brothers' cousin, testified that on July 31, 1976, he was present at William Colley's apartment. He testified to the same sequence of events as McCormick. The court refused to let defense counsel impeach Rowe with the fact that he was on supervision for robbery while a juvenile.

Epplen testified that the defendant accompanied him to the police station on August 19, 1976. She initially denied any involvement in the robbery and murder, but later acknowledged that her previous statement was not true, and admitted her involvement in the crimes. On cross-examination Epplen testified that he had had an earlier conversation with the defendant. At that time, she informed him that approximately a week before the murder she witnessed an argument between William Colley and the victim, concerning some money that William Colley owed the victim. Shortly after this, Kenneth Colley made the statement that he did not like the fact that his father was being embarrassed and that he would like to teach the victim a lesson.

Donnersberger testified that in the early morning hours on August 20, the defendant gave him a statement concerning her involvement in the robbery and murder. Donnersberger read the document in open court.

He also testified that the defendant never told him that the Colley brothers forced her to commit any criminal act.

The court allowed defense counsel to amend his discovery answer by adding to his list of witnesses Michael Bradford, a law student who was present during a conversation involving McCormick, and Mrs. Spears, a record keeper at the Cook County jail. The State objected arguing that Bradford had violated the witness exclusionary rule by remaining in the courtroom after it was clear that his testimony would be necessary to impeach McCormick. Bradford was in court during almost all of the testimony in the case. The defense argued that no actual prejudice to the State had occurred and that Bradford should be allowed to testify to a conversation which occurred between defense counsel and McCormick. The court refused to allow the defense to call Bradford as a witness because Bradford had violated the exclusionary rule. The defense made an offer of proof in which he said that if Bradford were allowed to testify he would state that two days prior to McCormick's in-court testimony she told defense counsel that Epplen threatened to charge her with murder and take·her children away if she did not cooperate with the police.

The State also objected to Spears' proposed testimony which would establish that Kenneth Colley was in the Cook County jail from May 21 to July 19, 1976. The defense offered this testimony to impeach McCormick's statement that the defendant suggested to the Colley brothers that they rob the victim *"approximately three weeks"* before the actual offenses were committed. The defense argued that because Kenneth Colley was in custody exactly three weeks before the crime, no such conversation could have occurred. The court excluded Spears' testimony because McCormick had said that the conversation took place "approximately" three weeks before the robbery and murder, and, therefore, a direct contradiction was not present.

The defendant testified that on July 31, she and her children went to William Colley's apartment for dinner. They were joined by Colley's two sons, Kenneth and Charles, and Charles' wife, McCormick. Kenneth asked his father if the victim had given him any more trouble about the money owed him. Mr. Colley said no. Kenneth said he did not like the way the victim had treated his father and that the victim should be taught a lesson. The defendant told Kenneth that the victim was an old man and Kenneth should leave him alone.

A little while later Bunch, Kenneth's wife, came to the apartment.. Kenneth again brought up the subject of robbing the victim. Kenneth decided that the defendant and Bunch should go up to the victim's apartment. The defendant said she did not want to be involved. Kenneth then threatened the defendant and said if she knew what was best for her she had better do as she was told. Kenneth had a large knife in his hand

while he was speaking to the defendant and he was standing only a few feet away from her children. The defendant testified that she was afraid of Kenneth.

The defendant took Bunch upstairs to the victim's apartment and told the victim that Bunch had been looking for him. The defendant then went back downstairs to William Colley's apartment. Bunch returned in 15 or 20 minutes and said the victim told her to leave his apartment. Kenneth and Charles decided the defendant should go up to the apartment and put the knock-out drops in the victim's drink. The defendant said she would not do it, but when Kenneth again threatened her with the knife she acquiesced. The victim let the defendant into his apartment and she put the knock-out drops in his coffee while he was in the kitchen preparing a drink for her. After a while, the victim became dizzy and the defendant left his apartment. She told the brothers that the victim was about to pass out and they rushed upstairs. When the brothers had not returned in half an hour she became worried and went back upstairs. She found the victim's apartment torn apart and saw the victim lying on the floor with pillows on top of and underneath his head. The victim's hands were tied behind his back. Kenneth told the defendant to fill a bag with groceries and take it downstairs. Kenneth and Charles appeared in about 20 minutes and yelled at the defendant for not giving the victim enough knock-out drops. Kenneth told the defendant they had to "rough the old buzzard up." The defendant and her children remained in William Colley's apartment until the next morning.

In the morning, the defendant asked William Colley if anyone had seen the victim. When he replied negatively, the defendant asked if they should check on the victim's condition. William Colley told her to stay away from the victim's apartment. The defendant knocked on the victim's door several times that day but never received an answer. She finally broke into the victim's apartment at approximately 10:00 p.m. She found the victim on the floor with a chair on top of him, and discovered he was dead. She then returned to her apartment and called the police.

The defendant admitted that she lied to the police when she told them she happened to find the victim's door open while looking for one of her children. She also lied when she told the police that the victim often had young women at his apartment. She lied because she was afraid the Colley family might try to harm her or her children.

The defendant described her treatment at the police station in the same manner as she had at the suppression hearing. She denied willingly participating in the crime or having tied and gagged the victim.

On cross-examination the defendant admitted that the Colley brothers had never harmed her or her children; nor had they ever threatened her prior to the incident involved here. She admitted she never

called the police after the robbery took place. She also admitted that she did not tell the police or the Assistant State's Attorney that she was forced to commit the robbery by the Colley brothers. She testified that McCormick was lying when she said the defendant had planned the robbery and that Rowe lied about the events leading up to the robbery.

The defendant said she participated in the robbery because she feared for herself and her children. The court sustained the defense's objection to questioning the defendant about being placed on supervision for contributing to the neglect of her children.

Charles Colley was called in rebuttal by the State. Colley admitted that he was currently serving a prison sentence for the robbery and murder of the victim. He stated that no promises had been made to him in exchange for testifying against the defendant. Charles Colley stated that the defendant was the person who brought up the victim's name and suggested the robbery. When Sherry was unable to get the drug into the victim's drink the defendant called Sherry "a dumb bitch" and stated that "if you want anything done you have to do it yourself." Colley did not threaten the defendant either verbally or with a knife; nor did anyone else.

On cross-examination, Colley denied being present at a conversation prior to the crime at which the defendant suggested that the Colley brothers help her rob the victim. He denied that his father had been insulted by the victim or that he or his brother were trying to "get even" with the victim.

At the hearing in aggravation and mitigation, the State described the murder and robbery as being particularly heinous. They argued that the defendant had suggested the robbery and used her friendship with the victim to gain entry into his apartment. The defendant was also the one to administer the drug to the victim and she did not help the victim after the robbery or show any remorse about his death.

The defendant attempted to introduce the testimony of two of the jurors in mitigation. The State objected to the introduction of their testimony. The court refused to hear the testimony, stating that it was beyond the jurors' function as jurors and that their view had nothing to do with sentencing. Defense counsel made an offer of proof that both of the jurors believed the defendant should receive the minimum sentence.

Also in mitigation, the defense stressed the defendant's lack of a prior criminal record and the fact that the victim's death was brought about by the actions of the Colley brothers. The defense also argued that the evidence did not support the contention that the defendant had planned the entire crime. Finally, the defense asked for the minimum sentence so that the defendant could be reunited with her two children at an earlier

date. The court sentenced the defendant to not less than 21 nor more than 30 years in prison.

The defendant's first argument is that the court erred in not allowing her to impeach prosecution witness Rowe on the basis of his juvenile record. Rowe was 19 years old at the time of trial. The question to which an objection was sustained was: "Approximately four or five years ago were you placed on supervision at the Juvenile Court for robbery?" The jury was instructed to disregard the question.

■■ The defendant argues that because Rowe was 19 years old at the time of trial that he may have still been under court supervision and that this fact would indicate bias. She relies on *Davis v. Alaska* (1974), 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105, where the court found error in the trial court's refusal to allow the defendant to impeach a State witness on the basis of his probationary status as a juvenile delinquent.

We believe *Davis* is distinguishable in that the juvenile witness in *Davis* was a crucial identification witness and therefore essential to the prosecution. Rowe cannot be termed an essential witness because his testimony was the same as McCormick's and Charles Colley's testimony.

We also note that in *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695, the Illinois Supreme Court directed that then-proposed Rule 609 of the Federal Rules of Evidence (later adopted in essentially the same form; see Fed. Rules Evid. Rule 609) be followed in future Illinois cases. That proposed rule provided in part:

"(d) Juvenile Adjudications. Evidence of juvenile adjudications is generally not admissible under this rule. The judge may, however, allow evidence of a juvenile adjudication of a witness other than the accused if conviction of the offense would be admissible to attack the credibility of an adult and the judge is satisfied that admission in evidence is necessary for a fair determination of the issue of guilt or innocence." (47 Ill. 2d 510, 517, 268 N.E.2d 695, 699.)

Under the circumstances presented here, and on the basis of Rule 609, we conclude the trial court acted within its discretion in refusing to allow evidence of Rowe's juvenile adjudication to be admitted as impeachment evidence.

The defendant next argues the trial court erred in excluding the testimony of Bradford. Bradford had been a witness to a conversation between defense counsel Goldberg and McCormick which occurred two days before McCormick's testimony at trial. The trial court refused to allow Bradford to testify because he had violated the court's exclusionary rule. The defendant argues that Bradford would have presented crucial impeachment evidence in that he would have testified that McCormick

said Officer Epplen told her she would be charged with murder and her children would be taken away from her if she did not cooperate with the police.

Almost a century ago, in *Holder v. United States* (1893), 150 U.S. 91, 37 L. Ed. 1010, 14 S. Ct. 10, the Supreme Court addressed this issue. The *Holder* court wrote:

> "If a witness disobeys the order of withdrawal, while he may be proceeded against for contempt and his testimony is open to comment to the jury by reason of his conduct, he is not thereby disqualified, and the weight of authority is that he cannot be excluded on that ground merely, although the right to exclude under any particular circumstances may be supported as within the sound discretion of the trial court." (150 U.S. 91, 92, 37 L. Ed. 1010, 14 S. Ct. 10.)

The right of the trial court to exclude a witness who violates the exclusionary rule "under particular circumstances" was expanded upon by the Illinois Supreme Court in *People v. Bridgeforth* (1972), 51 Ill. 2d 52, 281 N.E.2d 617, where the court quoted with approval a case which interpreted the phrase to mean some indication that the witness was in court with the consent, connivance, procurement or knowledge of the appellant or his counsel.

The record establishes that all counsel agreed to an exclusionary rule at the commencement of the trial and that the rule was followed with the exception of the defendant's proposed witness Bradford. It is also clear that the defense had not planned to make Bradford a witness until McCormick took the stand and denied making certain statements about her conversation with Officer Epplen. That denial would have been impeached by Bradford's testimony relating a conversation McCormick had with defense counsel, according to the offer of proof. Therefore, until McCormick testified, there was no reason for anyone to think that Bradford was included in the court's exclusionary direction. However, Bradford should have left the courtroom when it became clear that McCormick was denying having made certain statements on a prior occasion. At the time of McCormick's denial, the State questioned the defense's ability to complete the impeachment with the testimony of anyone other than counsel, and Bradford's presence at the conversation and in the courtroom was made known at that time.

■■ Under the circumstances presented here, we conclude the exclusion of Bradford as a witness was error. The need to call Bradford to complete the impeachment of McCormick was not made known until McCormick took the stand and denied making the earlier statements. At this point, excluding Bradford from the courtroom would have been ineffective. The purpose of the exclusionary rule is to allow the trier of fact to compare

individual and independent accounts of the facts of the case. (*People v. Lake* (1977), 47 Ill. App. 3d 747, 365 N.E.2d 455.) By the time it became clear that Bradford should not have heard McCormick's testimony, she had already made the denials in question. Under these circumstances, the court's exclusion of Bradford's testimony was error because it served no valid purpose.

However, we believe this error was harmless in effect. Even though the impeachment was not perfected, the cross-examination of McCormick conveyed the idea that a prior inconsistent statement had been made by her. (See *People v. Bridgeforth* (1972), 51 Ill. 2d 52, 281 N.E.2d 617.) Additionally, we note that the subject of the impeachment concerned McCormick's questioning at the police station. The essential facts concerning the murder and robbery were not affected by this erroneous exclusion of testimony.

The defendant next argues the trial court should have admitted the testimony of Spears, the record keeper, for the purpose of impeaching the testimony of McCormick. McCormick testified to a conversation between Kenneth Colley and the defendant which occurred "approximately" three weeks prior to the July 31 crime. In an offer of proof the defense said that if Spears were allowed to testify she would say that Kenneth Colley was in Cook County jail from May 21 to July 19, 1976. The court excluded Spears' testimony because it was not directly contradictory due to the fact that McCormick had qualified her answer with the word "approximately." The defendant argues this conclusion concerns the weight to be given the impeaching testimony and that the question of weight should be left to the jury. The State argues Spears' testimony was not admissible at all because it was collateral in nature.

■■■ A party may not be impeached as to collateral matters. (*People v. Persinger* (1977), 49 Ill. App. 3d 116, 363 N.E.2d 897.) The often-quoted test for "collateralness" is whether the fact for which the testimony is offered in contradiction could have been shown in evidence for any purpose independent of the contradiction. (*Persinger.*) McCormick, a leading authority on evidence, describes three categories of facts which meet this test. McCormick gives the following example of one of those categories:

> "Suppose a witness has told a story of a transaction crucial to the controversy. To prove him wrong in some trivial detail of time, place or circumstance is 'collateral.' But to prove untrue some fact recited by the witness that if he were really there and saw what he claims to have seen, he could not have been mistaken about, is a convincing kind of impeachment that the courts must make place for * * *. To disprove such a fact is to pull out the linchpin of the story." (McCormick on Evidence §47, at 99 (2d ed. 1972).)

Therefore, a contradiction is not collateral if it involves a part of the witness's account which he would not have been mistaken about if his story were true. McCormick concludes: "This test is of necessity a vague one because it must meet an indefinite variety of situations, and consequently in its application a reasonable latitude of discretionary judgment must be accorded to the trial judge." McCormick, at 99-100. ■■ We conclude that the trial judge acted within the scope of his "reasonable latitude of discretionary judgment" in refusing to allow Spears to testify. McCormick testified that the conversation in question occurred "approximately" three weeks prior to the crime. That would mean the conversation occurred on approximately July 10. The defendant's offer of proof indicated that Spears would have testified that Kenneth Colley was in jail from May 21 to July 19, 1976. Under these circumstances we do not think it can be said that such a mistake about the date of the conversation is of the type referred to by McCormick such that the witness "could not have been mistaken about." A nine-day mistake as to *when* the conversation occurred does not compel the conclusion that the conversation never occurred. Therefore, we reject this argument.

The defendant next argues the trial court erred in refusing to ask or to allow the defense to ask the venire any questions about the affirmative defense of compulsion. The question proposed by the defense was:

> "Do you feel that a mother, to protect herself and her children, from being hurt, might involve herself in a crime, and even be willing to go to jail to protect herself and her children?"

The defense argues that this case is analogous to *People v. Moore* (1972), 6 Ill. App. 3d 568, 286 N.E.2d 6, where the appellate court reversed a conviction in part because the trial court had refused to have the venire questioned regarding their attitudes toward the defense of insanity. ■■ We reject this argument. Supreme Court Rule 234 (Ill. Rev. Stat. 1975, ch. 110A, par. 234) specifically provides that during voir dire "[q]uestions shall not directly or indirectly concern matters of law or instructions." The proposed question appears to us to concern the law of compulsion as applied to the facts of this case. Additionally, we believe the situation is analogous to that presented in *Hart v. State* (1976), 137 Ga. App. 644, 224 S.E.2d 755, where during voir dire the counsel for the defendant attempted to ask a prospective juror whether he thought that one would be justified in aiding a family member who was being attacked. The court excluded the question on the ground that it required the juror to prejudge the facts of the case. In a similar fashion, requiring an answer to the question posed here would have committed the jurors to a premature and improper acceptance or rejection of the contemplated

defense of compulsion. The jury was properly instructed on the defense of compulsion at the close of the evidence, and the trial judge acted within the bounds of his discretion in refusing to ask the proposed question concerning this defense during voir dire.

The defendant next argues the trial court erred in excluding the testimony of McCormick at the motion to suppress hearing where her testimony would have impeached that of Epplen, corroborated that of the defendant, and shown a course of police conduct which was designed to overbear the will of both McCormick and the defendant. The defense made an offer of proof that if McCormick were allowed to testify she would say that when she came to the station to be questioned she was told that she would be charged with murder unless she cooperated with the police and that her children would be taken from her. The defendant relies on a case holding that evidence of other crimes is admissible against a defendant where the testimony would tend to show a modus operandi. See, *e.g., People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489.

■■ The issue at the suppression hearing was whether the defendant's statement to the police was involuntary. The treatment McCormick received at the police station, even if identical to that allegedly received by the defendant, was not relevant to the issue under consideration. Cases concerning the admissibility of other crimes from which a course of conduct may be inferred are not analogous. We thus reject this argument.

■■ The defendant next argues that she was denied a fair trial when the prosecutor improperly asked her if she had been previously placed on supervision for child neglect. The defense argues that the defendant's defense of compulsion was prejudiced by the asking of this question because it contained the implication that she did not care for her children. The State responds that the defendant's treatment of her children was an issue in the case and the question thus proper and, alternatively, that even if error it was harmless.

The trial court directed the jury to disregard the question concerning child neglect and the defendant did not answer it. In *People v. Crotty* (1976), 44 Ill. App. 3d 413, 419, 357 N.E.2d 1360, 1364, this court noted: "Even where error has been committed at trial by improperly admitting evidence of another crime, a conviction will not be reversed unless it appears that real justice has been denied or that a jury verdict may have resulted from such error." Here, unlike *Crotty*, the question concerning the defendant's court supervision for child neglect was not answered and evidence of another crime was thus not admitted. Furthermore, the jury was instructed to disregard the question. Under these circumstances we cannot accept the argument that, first, the jury must have ignored the instruction to disregard the question, and, secondly, that the guilty verdict

was prompted by the rather strained inference that a person who could commit child neglect could not be entitled to a defense of compulsion based on fear for herself and her children.

The defendant's next argument is that she was not proved guilty of robbery and murder beyond a reasonable doubt where the State failed to overcome the affirmative defense of compulsion beyond a reasonable doubt.

The defense of compulsion has been codified in the following terms:

> "A person is not guilty of an offense, other than an offense punishable with death, by reason of conduct which he performs under the compulsion of threat or menace of the imminent infliction of death or great bodily harm, if he reasonably believes death or great bodily harm will be inflicted upon him if he does not perform such conduct." (Ill. Rev. Stat. 1975, ch. 38, par. 7— 11(a).)

Compulsion is an affirmative defense (Ill. Rev. Stat. 1975, ch. 38, par. 7— 14) and, therefore once properly raised by some evidence of the defendant, the State must overcome it by proof beyond a reasonable doubt. Ill. Rev. Stat. 1975, ch. 38, par. 3—2(b).

The defense of compulsion is a question of fact which the trier of fact must resolve. (*People v. Nurse* (1975), 34 Ill. App. 3d 42, 339 N.E.2d 328.) The trier of fact, in this case the jury, must determine the credibility of witnesses and weigh their testimony. This determination is a matter peculiarly within the province of the jury and a reviewing court will not substitute its judgment unless the proof is so unreasonable, improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *Nurse.*

■■ Assuming that the defense of compulsion was properly raised, we believe the jury's conclusion of guilt was not so unreasonable, improbable or unsatisfactory as to create a reasonable doubt of that guilt. The jury was entitled to believe the testimony of witnesses McCormick, Rowe and Charles Colley. Those three witnesses each testified that the defendant suggested the plan to rob the victim. McCormick said she heard no one threaten the defendant or her children, and Charles Colley testified that he did not threaten the defendant and also denied the existence of a knife. Under these circumstances we must conclude that even if the defense of compulsion was properly raised, it was overcome by the State with proof beyond a reasonable doubt. Ill. Rev. Stat. 1975, ch. 38, par. 3—2(b).

The defendant next argues, and the State agrees, that the robbery sentence exceeded the statutory maximum and must therefore be vacated and remanded for a new sentence by the trial court. The defendant was sentenced to a term of 21 to 30 years in the penitentiary. Judgment was

entered on both convictions. Robbery is a Class 2 felony (Ill. Rev. Stat. 1975, ch. 38, par. 18—1(b)), and the sentence for a Class 2 felony is not to exceed 20 years. (Ill. Rev. Stat. 1975, ch. 38, par. 1005—8—1(b)(3).) The robbery sentence is therefore vacated.

■■ The defendant next argues the court erred in refusing to hear the testimony of two jurors who wished to testify on her behalf at the hearing on aggravation and mitigation. She offers no authority in support of the proposition that jurors are proper witnesses at a sentencing hearing. We find no merit in this contention. It is the jury's function to determine guilt and the judge's function to impose sentence. Because the judge heard all the testimony that was heard by the jurors, there is no reason to believe that they could have added any pertinent information at the hearing on aggravation and mitigation.

The defendant's final argument is that the murder sentence was excessive. The minimum term for the offense of murder is 14 years (Ill. Rev. Stat. 1975, ch. 38, par. 1005—8—1(c)(1)) and the defendant was sentenced to 21 to 30 years. The judge heard arguments in mitigation and aggravation, and, before imposing sentence, stressed the fact that the victim thought the defendant was his friend, and that he had no way of knowing that she was planning to rob him.

■■ Sentencing is a matter of judicial discretion and, absent a clear abuse, the sentence imposed by the trial court may not be altered by a reviewing court. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) The trial judge is in a better position to determine the appropriate punishment in a particular case and we cannot say the judge below abused his discretion in sentencing the defendant to a term of 21 to 30 years on the murder charge.

For the reasons expressed herein, the convictions and murder sentence are affirmed, the robbery sentence is vacated, and the cause is remanded for resentencing on the latter.

Affirmed in part, vacated in part, and remanded.

LINN and ROMITI, JJ., concur.