First Division
 September 23, 1996









No. 1-95-2600

THE PEOPLE OF THE STATE OF ILLINOIS, ) APPEAL FROM THE
 ) CIRCUIT COURT OF
 Plaintiff-Appellee, ) COOK COUNTY.
 )
 v. )
 )
JOSEPH MAPP, ) HONORABLE
 ) VINCENT GAUGHAN,
 Defendant-Appellant. ) JUDGE PRESIDING.


 JUSTICE WOLFSON delivered the opinion of the court:
 During jury selection in this murder and armed robbery case 
the prosecutors made a shambles of Supreme Court Rule 234. They 
indoctrinated, preeducated, conditioned, and pretried. 
 After both sides rested, the State's final argument
contained improper references to the victim's surviving family. 
 Joseph Mapp (Mapp) was convicted by the jury and sentenced
to 55 years for murder and 25 years for armed robbery, the
sentences to be served concurrently.
 Despite our misgivings about the way the jury was selected 
and about the State's final argument, our review of the evidence 
persuades us that the convictions should be affirmed.
FACTS
 Joseph Mapp was arrested the day after Larry Shelton
(Shelton) was killed. After Mapp was arrested, he made a
statement. The statement was read to the jury. According to the
statement, a few nights before August 12, Mapp, Joseph Martin
(Martin), and Joseph Richardson (Richardson) were riding around
in Mapp's mother's Isuzu Rodeo. Martin said Shelton owed him
money. The three came up with a plan to get the money back. 
They decided to point a gun at Shelton and ask for it, thinking
Shelton would not refuse. Mapp suggested they use masks to hide
their identities.
 When Mapp picked up Martin to drive around in the Rodeo on
August 11, 1993, Martin had a Tech 9 gun with him. When they saw
Shelton in his van, they decided to carry out their plan. Martin
gave Mapp the Tech 9. Mapp saw that the gun was loaded. They
put on their masks. Mapp borrowed Richardson's jacket to hide
his hair. Mapp and Martin left the truck.
 Mapp and Martin approached Shelton, who was walking with his
family, from different sides. Martin shot Shelton. Shelton
dropped everything he was carrying. Mapp approached Shelton with
the Tech 9 and picked up two key chains Shelton had dropped. He
shoved Shelton in the back. Martin shot Shelton again. Mapp
stepped back to avoid being shot himself. Martin fired several
more shots. Then Mapp and Martin ran off. As they did, they
threw away their masks and jackets. Richardson saw them and
picked them up in the Rodeo. Mapp and Martin suggested that the
guns be wiped to destroy fingerprints. Richardson agreed to do
this. Mapp went to his girl friend's house. That was the
statement.
 An assistant State's Attorney testified he read the entire
statement to Mapp. Mapp signed the statement and initialled
corrections. Mapp can read and has completed four years of high
school.
 Shelton's daughters, Robin and LaDonna, and his fiancee,
Stephanie Turnbull (Turnbull), testified for the State as
eyewitnesses. They described what happened early in the morning
of August 12, 1993. At that time, they, Shelton, and two other
children returned home from an evening outing. Turnbull was
carrying her and Shelton's two-month-old son. They lived at 3500
S. Lake Park in Chicago, Illinois. They parked on the street in
front of the building. Everyone but Turnbull walked to the
building. Turnbull stayed at the van to lock it, then followed
the others.
 Two men approached Shelton. The men carried guns. They
wore masks. Although Ladonna knew Martin and Mapp, she could not
identify them because of the masks. One man had a silver gun,
the other a black gun. Later testimony showed Martin had the
silver gun and Mapp had the black gun. 
 The eyewitnesses' description of the incident was similar to
Mapp's. In addition, Robin said the first shot hit her in the
ankle. The children then ran to the building. They heard four
to five more shots.
 LaDonna had seen Martin, Mapp, and Richardson in the parking
lot just before the incident. She saw Martin and Mapp head
toward her building. She saw a blue Isuzu Rodeo truck the three
often used.
 Turnbull said as the man with the silver gun started
shooting, the man with the black gun shoved Shelton, searched his
pockets, and grabbed a chain from around his neck. The man with
the black gun pointed it at Turnbull and the baby. The two then
ran past her, taking off their masks.
 When the black gun was later found, no bullets had been
fired. Only one mask was found.
 Shelton died from multiple gunshot wounds. All the shots
came from Martin's gun.
 At trial, Mapp testified in his own defense. He said he did
not plan to rob anyone. He cooperated with the police because he
believed if he implicated Martin, they would return his mother's
truck and let him go. He claimed the assistant State's Attorney
had not read him the entire summary and he did not read it
himself. He had the opportunity to read it. Mapp specifically
denied hearing any sentence that implicated him as an accomplice. 
He admitted to hearing the attorney read every sentence that did
not implicate him. 
 Mapp testified that on the night of the shooting, he,
Martin, and Richardson set out to find a couple of girls Mapp
knew at 3500 S. Lake Park. Richardson left them there and took
the Rodeo to get his own girl friend. As Mapp and Martin walked
towards the building, Martin produced a gun. He asked Mapp to
hold it for a second. Mapp did not know Martin had a gun or why
he had a gun. Martin put on a mask and ran up to Shelton. Mapp
followed to tell Martin to stop. Martin fired his gun and
Shelton dropped his keys. Mapp picked up the keys to give them
to Shelton. Martin continued to shoot Shelton. Mapp got out of
the way because he could not stop Martin. 
 Mapp then ran off. Martin followed him. Mapp threw away
the gun and the keys. He took off his jacket when Martin told
him to.
 When Mapp was taken into custody the next day, he told the
police he didn't know about any killing. Mapp said he told the
police this because he did not know Shelton was dead. At one
point he said the police did not beat him. Later Mapp said one
detective slapped him a couple of times. Mapp claimed the
assistant State's Attorney told him if he gave a statement, he
could go. 
 During rebuttal, the State's witnesses said no one made any
promises in exchange for the statement. The assistant State's
Attorney did not skip the sentences that incriminated Mapp. No
one hit Mapp.
 The jury learned during the trial that Martin was killed
shortly after the incident. The circumstances of his death are
not in the record.
 The jury found Mapp guilty of murder and armed robbery. 
OPINION
 (1) Prosecution questions during jury selection
 The shooter was dead. No witness said Mapp pulled the
trigger. His conviction would have to be based on a theory of
accountability. The prosecutors apparently were concerned that
the jury would disregard the evidence and the law. There can be
no other explanation for the questions they asked during jury
selection.
 Out of a total of 33 jurors interviewed during voir dire,
the State asked 15 potential jurors about their views of
accountability and felony murder principles. Eight served as
jurors and one served as an alternate.
 The State said to the first venireperson: "We're going to be
talking about something called felony murder here. It's where
somebody, in this case we believe the defendant, and others got
together to commit a crime. And during the course of that crime
a man was killed. Will you follow the law which talks about
criminal responsibility for an individual where he is not
necessarily the person who pulls the trigger?" Mapp did not
object to this question. The venireperson served as a juror.
 The State asked the next venireperson: "Do you have any
problem with the law of criminal responsibility and one for the
actions of another when you're part of that agreement?" Mapp's
objection was overruled. The venireperson served as a juror.
 The State asked another venireperson: "Do you have any
problem with the law of criminal responsibility which talks about
being responsible for the actions of another when you're part of
the plan?" Mapp objected to the question. The court overruled. 
The venireperson asked to hear the question again. The State
replied, "Do you have any problem with following the law of
criminal responsibility?" The venireperson served as a juror.
 The State asked another venireperson: "Do you have any
problem with any of the things we have been talking about, about
the law of criminal responsibility?" The venireperson's reply
was nonresponsive. She was excused.
 The State asked another venireperson: "Would you also follow
the law of criminal responsibility? In this case we're not
saying he's the shooter. Would you have any problems following
the law of criminal responsibility that if he helped someone or
aided someone in the commission of an offense like armed robbery,
that he could be found guilty of murder for aiding in the
commission and planning of that offense?" Mapp's objection was
overruled. The State asked: "Do you have any problem with that
concept?" When the venireperson said "no," the State followed up
with: "Do you have any problem following the law of felony
murder, which means that even if he didn't intend for the guy to
be murdered during the armed robbery but someone else murdered
him but the fact that he helped in the commission of the armed
robbery means that he's guilty of murder? Do you have a problem
following that law?" Mapp's objection was again overruled. The
State asked, "You wouldn't have any problem following that; is
that correct?" The venireperson served as a juror.
 The State asked the next juror: "Would you follow the law of
criminal responsibility, that if he aided in the commission or in
the planning of an armed robbery, that he is guilty of murder as
well? Do you have any problems following that law, sir, even
though he's not the shooter?" Mapp did not object. The
venireperson served as a juror.
 The State later asked an entire panel of potential jurors:
"Do you have any problems with the law of criminal
responsibility? You're never going to hear anything about him
being a shooter or anything like that, but do you have any
problems with the law of criminal responsibility that if he aided
in the planning or commission of an armed robbery then that makes
him guilty of the murder? Do you have any problems with
following that kind of law?" The State also asked the venire
members: "According to the law it's called felony murder, that
even if he didn't intend the person to be killed or shot, the
mere fact that he participated and aided in the armed robbery
makes him guilty of murder. Do you have any problems with that
or anything?" Mapp's objection was overruled. Three of the
venire members served as jurors.
 The State had a long discussion with another venireperson:
 "[State]: Would you have any problems about the law of
 criminal responsibility? You probably heard me out
 there when I was asking everyone else. Would you have
 any problems with we're not going to say he's the
 shooter in this case but we are going to prove or show
 that he aided in the planning and in the commission of
 an armed robbery wherein someone died which makes him
 guilty of murder? Would you have any problems
 following that law?" 
 [Defense Counsel]: Objection
 Court: Objection noted. Overruled.
 [State] Q. Would you have any problems following that
 law?
 A. No.
 Q. Even though he's not the shooter, you don't have any
 problems following that law?
 A. No.
 Q. Would you have any problems following the law that
 says it doesn't matter whether he intended the guy to
 die or not or whether he knew that the other guy was
 going to shoot him, that he would still be guilty of
 murder? Would you have any problem with that law?
 A. Did he know?
 Q. Say he didn't even know the guy was shooting him. 
 He's just along for the armed robbery. Even if he
 didn't know the guy was going to shoot him he's still
 guilty of murder? Do you have a problem with that?
 A. I don't know about that. Yeah.
 Court: *** there are no wrong answers. Just tell us
 what you feel.
 [Venireperson]: Guilt by association, I don't know if I
 agree with that.
 [State] Q. Would you still follow the law even though
 you don't agree to it?
 A. Yeah. 
 Q. If you got instructed on the law, it says even
 though he didn't know the other guy was going to kill
 him but since he went along and participated in the
 armed robbery of the guy, that he would be guilty of
 murder?
 A. That's what the law states.
 Q. If that's what the law says would you follow that,
 sir?
 A. You'd have to. 
 Q. Would you also follow it too if that's the law the
 way the judge instructs you?
 A. Yes.
 Q. I know it sounds kind of different. But is there
 any problems following that law?
 A. No.
 Q. No, sir?
 A. No."
 This venireperson did not serve on the jury.
 The State examined a potential second alternate juror, but
apparently not in the presence of jurors already selected and
sworn. The State asked: "Do you understand what my partner was
talking about when he asked the other people in the jury box
about the law of criminal responsibility? *** That when you're
part of the plan when you set up an armed robbery with other
people and you get guns and masks and things you can be found to
be responsible for that crime even though somebody else is the
one who actually did the shooting?" The venireperson served as
second alternate. 
 Supreme Court Rule 234 tells us that questions to the jurors
"***shall not directly or indirectly concern matters of law 
or instructions." The rule is made applicable to criminal cases 
by Rule 431. 
 The Supreme Court has said: "The purpose of the voir dire
examination is to assure selection of an impartial jury; it 
is not to be used as a means of indoctrinating a jury, or 
impaneling a jury with a particular predisposition." People v. 
Bowel, 111 Ill. 2d 58, 64, 488 N.E.2d 995 (1986). This court 
has said that voir dire should not be converted into a "vehicle 
for pre-educating and indoctrinating prospective jurors as to 
a particular theory or defense or impaneling a jury with 
particular predispositions." People v. Kendricks, 121 Ill. App. 
3d 442, 449, 459 N.E.2d 1137 (1984), quoting People v. Byer, 75
Ill. App. 3d 658, 670, 394 N.E.2d 632 (1979).
 Despite the clear language of the rule, and the judically 
pronounced purpose of the jury selection process, reviewing
courts continue to deal with attempts by prosecutors and defense
lawyers to pre-educate jurors on matters of law. At times, Rule
234 has been honored in the breach. 
 A trial court does not abuse its discretion during voir dire
where the questions to jurors create "a reasonable assurance that
any prejudice or bias would be discovered." People v. Dow, 240
Ill. App. 3d 392, 397, 608 N.E.2d 259 (1992).
 The Supreme Court has held that Rule 234 is not offended 
when judges ask, as they must, whether potential jurors 
understand the defendant is presumed innocent, the State has 
the burden of proving guilt beyond a reasonable doubt, and the 
defendant's failure to testify cannot be held against him. 
People v. Zehr, 103 Ill. 2d 472, 469 N.E.2d 1062 (1984).
Ordinarily, a defense lawyer's questions concerning a specific
defense will be excluded. Bowel, 111 Ill. 2d at 64 (questions
about beliefs concerning mistaken identity); People v. Dunum, 182
Ill. App. 3d 92, 101, 537 N.E.2d 898 (1989) (questions about
beliefs concerning self defense); Byer, 75 Ill. App. 3d at 670,
(questions about compulsion defense).
 The defendant does have a right to have jurors questioned 
about their willingness to follow the law on the insanity 
defense. People v. Stack, 112 Ill. 2d 301, 493 N.E.2d 339
(1986).
 Why questions about the insanity defense but not compulsion 
or self-defense? The Supreme Court supplied the answer: "***the 
jury was going to be asked to apply an extraordinarily 
controversial legal requirement against which many members of 
the community may have been prejudiced." Stack, 112 Ill. 2d at
312. That is, the insanity defense is a "subject 
of intense controversy," and simply asking jurors whether they 
could faithfully apply the law as instructed was not enough 
to reveal juror bias and prejudice toward that defense. Stack,
112 Ill. 2d at 313.
 In an aggravated battery case, People v. Lanter, 230 
Ill. App. 3d 72, 73, 595 N.E.2d 210 (1992), where the defense 
was intoxication, the defense lawyer asked a juror: ""***do any
of you have any feelings concerning the use of alcohol or drugs 
which could affect your ability to be a juror in this case, 
if there were testimony about alcohol or drugs?" The State's 
objection was sustained. Citing Stack, the court reversed the 
defendant's conviction, holding that the defense was 
controversial enough to justify the inquiry. Sustaining the
objection prevented the defendant from intelligently exercising
his peremptory challenges. Lanter, 230 Ill. App. 3d at 75. 
Earlier, in People v. Murawski, 2 Ill. 2d 143, 147, 117 N.E.2d 88
(1954), an abortion case, the court held it was error to bar the
defense question: "Are you of the opinion that an abortion should
never be performed"?
 Prosecutors, too, may inquire into the possible biases of 
prospective jurors. We recently held that the trial court did 
not abuse its discretion when it allowed the State to ask whether
any of the prospective jurors would be unable to be fair and 
impartial because some witnesses were involved in interracial 
relationships. People v. Clark, 278 Ill. App. 3d 996, 664 N.E.2d
146 (1996). In Clark we noted that people of all races "have 
strong negative feelings about interracial relationships." 
Clark, 278 Ill. App. 3d at 1004.
 In People v. Faulkner, 186 Ill. App 3d 1013, 542 N.E.2d 1190
(1989), the State was permitted to ask jurors whether they would 
be prejudiced by the lack of a body in a murder case. And in 
People v. Freeman, 60 Ill. App. 3d 794, 799-800, 377 N.E.2d 107
(1978), it was not error for the prosecutor to ask a 
prospective juror: "[Would you] find it difficult in your own 
mind to find a verdict of guilty if a good portion of the 
evidence which you heard is what is called circumstantial 
evidence?"
 Some State questions to prospective jurors have gone too 
far. In People v. M.D., 231 Ill. App. 3d 176, 197, 595 N.E.2d
702 (1992), the trial judge was in error when he allowed
prosecutors to repeatedly ask jurors whether hearing two versions
of events would automatically create reasonable doubt in their
minds. 
Questions about whether jurors believed people had a natural 
impulse to confess their wrongdoings or whether murder of a 
family member could be a solution to family problems were held 
improper in People v. Bell, 152 Ill. App. 3d 1007, 10l7-18, 
505 N.E.2d 365 (1987). And in People v. York, 93 Ill. App. 2d 
180, 181-82, 235 N.E.2d 159 (1968), it was error to allow the 
prosecutor to ask: "Do you know any attorneys that practice 
law as far as defense of criminals is concerned?"
 The first question we must decide is whether the law of 
accountability is a subject jurors can be asked about, bearing 
in mind that the scope of voir dire is a matter for the trial 
judge's "broad discretion." Dow, 240 Ill. App 3d at 396. 
 We have examined the cases where questions about the law 
of accountability became an issue during jury selection.
 In People v. Lykins, 65 Ill. App. 3d 808, 382 N.E.2d 1242 
(1978), the trial judge asked prospective jurors if they would 
follow the law of accountability. The court seemed to hold the 
questions violated Rule 234, but that the error was not 
reversible.
 The defense asked the trial judge to inquire into juror
attitudes towards accountability and identification evidence in
People v. Washington, 104 Ill. App. 3d 386, 432 N.E.2d 1020
(1982). The judge refused. Finding no abuse of discretion, the
Court said: "There is no reasonable likelihood that potential
jurors will have fixed opinions or biases concerning either
identification evidence or the law of accountability." 
Washington, 104 Ill. App. 3d at 391.
 The Supreme Court spoke briefly on the subject in People 
v. Davis, 95 Ill. 2d 1, 18, 477 N.E.2d 353 (1983). There, the 
prosecutor asked two prospective jurors who later were selected: 
 "***The Court will instruct you about this, this aspect
 of the law, that a person can be held accountable and
 responsible for the acts of another. Would it affect
 your ability in deciding this case on the issue or the
 charge of murder provided that the law states that the
 defendant could be held accountable under the facts that
 the defendant, this defendant before you, did not do the
 direct act, did not pull the trigger of the gun so to
 speak, that caused the death of the individual. Do you 
 think that would affect your ability to decide or could
 you follow that law?"
 The court held that the prosecutor did not instruct the 
jury as to the applicable law. "Rather," said the court, "he 
merely inquired as to whether the jurors could follow the law
even if the evidence revealed that the defendant did not actually
do the shooting." Davis, 95 Ill. 2d at 18. There was no error.
 A defense request to ask jurors whether the defendant being
at the scene of the violence would create an assumption that 
he probably is guilty was refused by the trial judge in People 
v. Nunn, 184 Ill. App. 3d 253, 273, 541 N.E.2d 182 (1989). The 
court held there was no error because the suggested questions 
were intended to test the jurors understanding of the law of 
accountability before they were instructed on accountability 
principles.
 Finally, in People v. Johnson, 276 Ill. App. 3d 656, 659 
N.E.2d 22 (1995), we held it was not error to allow the
prosecutor to briefly recite accountability principles and
inquire whether potential jurors could follow the law relating to
those principles.
 Given these decisions, we conclude, despite the proscription
of Rule 234, that potential jurors may be given a brief and fair
summary of accountability principles and then be asked if they
could properly apply those principles to the evidence. The
purpose of the inquiry is "to discern fundamental bias or
misperception of the prospective jurors." Nunn, 184 Ill. App. 3d
at 273. The matter is within the trial judge's discretion.
 Concluding that some inquiry about accountability may be 
appropriate is not a condonation of the questions asked in this 
case. These prosecutors went far beyond a search for fundamental
bias or misperception of accountability principles. No reported 
decision supports the questions that were asked in this case.
 We have set out in some detail the questions asked and the 
statements made. They include the prosecutor's personal opinion 
("Somebody, in this case we believe the defendant, and others 
got together to commit a crime"), muddled statements of law 
("Do you have any problem with the law of criminal responsibility
and one for the actions of another when you're part of that 
agreement?"), incomplete and misleading statements of law ("Would
you have any problems following the law that says it doesn't 
matter whether he intended the guy to die or not or whether 
he knew that the other guy was going to shoot him, that he would 
still be guilty of murder?"), and inappropiate previews of the 
evidence ("That when you're part of the plan when you set up 
an armed robbery with other people and you get guns and masks 
and things you can be found responsible for the crime even though
somebody else is the one who actually did the shooting?").
 This was indoctrination and conditioning, pure and simple.
The jurors were being asked to prejudge the facts. It was a 
preliminary final argument. The defense lawyer kept objecting. 
The trial judge never should have allowed the questions. It 
was an abuse of discretion. Rule 234, whatever else it means,
grants the trial judge primary responsibility for conducting 
the jury selection process. He should accept that
responsibility. 
 We must consider the impact of the error. This is not a 
case where a juror deceives or misleads the defendant, giving 
answers that hide a disqualifying fact or state of mind. See 
People v. Green, --- Ill. App. 3d ---, 668 N.E.2d 158 (1996);
People v. Mitchell, 121 Ill. App. 3d 193, 459 N.E.2d 351 (1984);
People v. Oliver, 50 Ill. App. 3d 665, 365 N.E.2d 618 (1977). In
those instances the right to a fair trial is compromised and 
there can be no harmless error.
 We have carefully reviewed the record. The properly
admitted evidence in this case was so overwhelming that no
fair-minded trier of fact could reasonably have voted to acquit
the defendant. See People v. Carlson, 92 Ill. 2d 440, 449, 442 
N.E.2d 504 (1982). We conclude, as the court did in M.D., 231
Ill. App. 3d at 197, that the error resulting from the
prosecutors' questions was harmless beyond a reasonable doubt. 
 (2) The prosecution's final argument
 Not content with a detailed, signed confession and the 
corroborating testimony of three eyewitnesses, the prosecutor 
said in final argument:
 "This man is Larry Shelton [the victim]. He should
 have had the chance to see his two-month old boy learn
 to crawl, learn to walk, learn to speak. He should have
 had the opportunity to see his daughters grow up and
 become young women.
 The Court: All right. State, move on from that part of
 it, all right?
 The State: And the chance to spend his life with Stephanie
 [victim's fiancee].
 Defendant: Objection.
 The Court: All right. I've directed the State to move on.
 The State: But that's all gone now. It's all gone because 
 of meanness."
 The prosecutor's remarks had nothing to do with the issues 
in the case. They were a blatant appeal to the jurors' sympathy 
and emotions. Similar remarks were described as "improper, 
inexcusable and unprofessional" in People v. Bartall, 98 Ill. 
2d 294, 323, 456 N.E.2d 59 (1983). There is nothing new about 
judicial condemnation of these kinds of remarks about the family 
left behind. See People v. Hope, 116 Ill. 2d 265, 277-78, 
508 N.E.2d 202 (1986); People v. Bernette, 30 Ill. 2d 359, 371, 
197 N.E.2d 436 (1964); People v. Beringer, 156 Ill. App. 3d 309, 
314-15, 509 N.E.2d 578 (1987); People v. Littlejohn, 144 Ill.
App. 3d 813, 827-28, 494 N.E.2d 677 (1986). By now, the point
should have been made.
 The trial judge in this case immediately recognized the 
impropriety of the prosecutor's remarks. Unfortunately, the 
only thing he did about them was to say "move on." We doubt 
that "move on" signified official disapproval of the remarks 
to the jury. We also note that the prosecutor, with impunity, 
twice ignored the directive to "move on."
 The defendant points to another instance of improper final 
argument by the State. During rebuttal, the prosecutor said:
 "No question Joe Martin [the shooter] is a bad
 guy. He probably got what he deserved, however he
 passed away or whatever. I'm sure there is no love
 lost for Joe Martin. But also remember, birds of a
 feather stick together." 
 The "birds of a feather" remark was an improper guilt by 
association contention, (People v. Ong, 94 Ill. App. 3d 780, 
790, 419 N.E.2d 97 (1981)), and the trial judge erred when he
overruled the defense objection to it.
 Again, we face the dilemma of what to do about serious 
prosecutorial misconduct where the overwhelming evidence points 
to the defendant's guilt. We note that the defendant makes no 
claim of error concerning the stages of the trial where evidence 
was presented. We reluctantly conclude, as the Supreme Court 
did in Bartall, 98 Ill. 2d at 323, that the improper remarks most
likely did not play a role in the jury's return of a guilty
verdict. Also see People v. Free, 94 Ill. 2d 378, 414-15, 447
N.E.2d 218 (1983). 
 (3) The defendant's sentence
 Mapp contends his sentence was excessive. Because he did 
not file a written motion challenging the sentence
(730 ILCS 5/5-8-1(c) (West Supp. 1996)), he has waived all but
plain error. See People v. McCleary, 278 Ill. App. 3d 498, 663
N.E.2d 22 (1996).
 The trial judge properly reviewed mitigating and aggravating
facts. The sentence of 55 years is less than the maximum of 
60 years. We see nothing in the record that indicates plain 
error or an abuse of discretion. See People v. Illgen, 145 Ill. 
2d 353, 359, 583 N.E.2d 515 (1991).
CONCLUSION
 Despite the unjustified and unnecessary prosecutorial 
misconduct in this case, the strength of the State's evidence
convinces us beyond a reasonable doubt that the errors we have 
described did not affect the verdict of the jury. We caution 
that affirmance on harmless error grounds must not be taken 
as a license for repetition of this misconduct in some future 
case.
 AFFIRMED
 CAMPBELL, P.J. and BRADEN, J., concur.