THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HERBERT KENDRICKS, Defendant-Appellant.

First District (2nd Division)   No. 81—2978

Opinion filed January 31, 1984.

Steven Clark and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, James S. Veldman, and Thalia B. Photos, Assistant State's Attorneys, of counsel), for the People.

JUSTICE STAMOS delivered the opinion of the court:

Defendant Herbert Kendricks was charged by indictment with two counts of murder and one count of armed violence. Defendant was tried before a jury which found him guilty of murder and voluntary manslaughter. Judgment was entered on the murder verdict, a sentencing hearing was conducted, and defendant was sentenced to

35 years' imprisonment. Defendant appeals.

Defendant emerged from a lounge at 62d and Ashland in Chicago at about 9:30 or 10:30 p.m. on July 18, 1980. He saw his friends, Tony and Raymond Givens, shooting dice on the corner with Larry Green. Green and Tony began to argue and a fight ensued. Green had Tony pinned on the ground as he beat him. Green jumped up and yelled at defendant, "I told you I was going to get your motherfucking ass." Defendant was standing six to seven feet to the left of Green when Green began approaching him. Green reached behind his back with his right hand. Defendant thought Green was going to shoot him, so he pulled out his own gun and began shooting at Green. Defendant claims he was so frightened that he just continued firing his gun, unaware of whether he had hit Green. In all, four shots were fired. One struck Green in the side of the head, the other struck Green's right buttock. Green was pronounced dead on arrival at the hospital.

Defendant was arrested at his mother's home at 5:30 or 6:30 a.m. on July 19, 1980, and was read the *Miranda* warnings. Initially, he was questioned concerning a robbery of an Aldi's Food Store. After signing a statement concerning the robbery, he was questioned about the shooting of Larry Green.

At noon or 1 p.m. that same day, defendant was taken to the Fourth District Station, then to the Area 3 station at 1:30 p.m. On the way to Area 3, he was given his *Miranda* rights, which he said he understood, and he was questioned regarding the shooting.

At the Area 3 station, defendant was again advised of his rights and gave a statement to the police. In this statement, defendant alleged that two unknown men were shooting dice with Green when one of them pulled out a gun and shot Green to death. Defendant also stated that the gun used to shoot Green was given to defendant by Raymond Givens, who had somehow come into possession of the gun.

Based on information given to them by defendant, the interrogators went to defendant's grandmother's house where the murder weapon was discovered.

The interrogators returned to interview defendant at 6 p.m. and again advised him of his rights. At that time, defendant told them that his earlier statement was a lie, and he offered a second version of the shooting of Green. Under this version, Tony and Raymond Givens were shooting dice with Green when Tony and Green began fighting. At this point, Raymond pulled out a gun and shot Green to death. Raymond later went to defendant's grandmother's house and gave defendant the murder weapon.

This interrogation of defendant ended after about an hour. The in-

vestigators who had been with defendant on and off during the day went off duty at around midnight on August 20.

At 10 a.m. on August 20, Assistant State's Attorney (hereinafter ASA) Ruber was called in to question defendant. He did so in the presence of two new interrogators after informing defendant of his *Miranda* rights. Defendant took this opportunity to offer yet a third version of the killing. Under this version, defendant and Green were fighting when a man named Raymond Brooks shot Green. Brooks later gave the murder weapon to defendant for his protection.

ASA Ruber had another conversation with defendant at about 11:30 a.m. at which the original interrogators were present. The questioning stopped when defendant said something to the effect that "I think I might need a lawyer," or "You know, I kind of think I know [*sic*] a lawyer, don't I." At this point, ASA Ruber left the room.

One of the interrogators took defendant aside, gave him his *Miranda* rights, and told him that he was making some incredibly contradictory statements and that ASA Ruber was taking them all down. The interrogator told defendant that they knew he was the killer and that he should confess. Defendant broke down, began to cry, and gave a confession to the interrogator.

ASA Ruber was then called back in and was told that defendant was ready to confess to shooting Green. Ruber asked defendant if he wished to talk without an attorney present and defendant stated that he did. A court reporter was called in, and defendant made a sworn statement in which he confessed to shooting Green in a dispute over a "crap" game. Defendant stated that Green was known to be violent and that he shot Green because he thought Green would kill him.

Defendant moved to suppress his confession on the ground that it was elicited despite his alleged invocation of his right to counsel. The motion was denied.

Following a jury trial, defendant was found guilty of murder and voluntary manslaughter. The trial court entered judgment on the murder conviction and, following a hearing in mitigation and aggravation, sentenced defendant to 35 years' imprisonment. Defendant appeals from the trial court's judgment and sentence.

Defendant first contends that the trial court erred when it entered judgment on the jury's murder verdict rather than on the voluntary manslaughter verdict. The trial court correctly concluded that voluntary manslaughter is considered a lesser included offense of murder. (*People v. Pierce* (1972), 52 Ill. 2d 7, 11, 284 N.E.2d 279.) It erroneously concluded, however, that a voluntary manslaughter verdict merges into a murder verdict.

■■ ■ The essential difference between murder and voluntary manslaughter is the mental state of the accused at the time of the killing. (*People v. Fox* (1983), 114 Ill. App. 3d 593, 595, 449 N.E.2d 261.) Murder requires malice conceived before the provocation whereas voluntary manslaughter is motivated by a sudden rage of passion engendered by adequate provocation or by an unreasonable belief that the killing was justified. (114 Ill. App. 3d 593, 595.) A finding that a killing was precipitated by a sudden rage or in self-defense necessarily negates the requisite level of intent for murder and thus constitutes an implied acquittal of a murder charge. 114 Ill. App. 3d 593, 595.

■■ In the instant case, the jury found defendant guilty of both murder and voluntary manslaughter. In finding defendant guilty of the latter charge, the jury necessarily ruled that the level of intent which motivated the killing was not malice aforethought, which is the state of mind required for murder. Thus, the jury impliedly acquitted defendant of murder and the trial court should have entered judgment on only the voluntary manslaughter verdict. See *People v. Fox* (1983), 114 Ill. App. 3d 593, 596; see also *People v. Taylor* (1976), 36 Ill. App. 3d 898, 900, 344 N.E.2d 742.

■■ Defendant next contends that the police elicited his confession after he had invoked his right to counsel and before he effectively waived that right.

While he was being interrogated and after he had been given his *Miranda* warnings, defendant made a statement to the police that "You know, I kind of think I know [*sic*] a lawyer, don't I," or "I think I might need a lawyer." Defendant asserts that by this statement, he was invoking his right to counsel and any subsequent incriminating statements elicited before counsel was present should have been excluded.

Under *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, where a defendant asserts "in any manner" his right to counsel, he has effectively invoked that right. (384 U.S. 436, 444-45, 16 L. Ed. 2d 694, 707, 86 S. Ct. 1602, 1612.) Some Illinois courts have held that virtually any reference to an attorney by a defendant in custody should be presumed to an exercise of the right to counsel. (See, *e.g., People v. Meyers* (1982), 109 Ill. App. 3d 862, 869-70, 441 N.E.2d 397; *People v. Starling* (1978), 64 Ill. App. 3d 671, 675, 381 N.E.2d 817; *People v. Rafac* (1977), 51 Ill. App. 3d 1, 4, 364 N.E.2d 991; see also *Maglio v. Jago* (6th Cir. 1978), 580 F.2d 202, 205 ("Maybe I should have an attorney").) Our supreme court, however, has rejected an interpretation of *Miranda* which would require "that

every reference to an attorney no matter how vague, indecisive or ambiguous, should constitute an invocation of the right to counsel." *People v. Krueger* (1980), 82 Ill. 2d 305, 311, 412 N.E.2d 537.

In *Krueger*, defendant was variously reported to have stated "Maybe I ought to have an attorney," "Maybe I need a lawyer," and "Maybe I ought to talk to an attorney." The interrogators did not interpret defendant's statement as a request for counsel and the interrogation continued and a confession was elicited. The supreme court ruled that the officers' interpretation of defendant's statement was reasonable because, under the circumstances, "a more positive indication or manifestation of a desire for an attorney was required than was made ***." 82 Ill. 2d 305, 312.

Decisions which have followed *Krueger* have held that ambiguous references to an attorney are not an exercise of the right to counsel. See *People v. Smith* (1983), 113 Ill. App. 3d 305, 309-10, 447 N.E.2d 556; *People v. Winston* (1982), 106 Ill. App. 3d 673, 683, 435 N.E.2d 1327; *People v. Harper* (1981), 94 Ill. App. 3d 298, 300-01, 418 N.E.2d 894; but see *People v. Meyers* (1982), 109 Ill. App. 3d 862, 869-70, 441 N.E.2d 397 ("Do you think I should have an attorney" or "Who do you recommend as an attorney").

■ In the instant case, the interrogation stopped when defendant made mention of an attorney. Thus it appears that the interrogators interpreted defendant's statement as an apparent exercise of his right to counsel. While it is true that the interrogators' subjective interpretation of defendant's statement is a factor in determining whether the right to counsel has been invoked (see *Maglio v. Jago* (6th Cir. 1978), 580 F.2d 202, 205), it should not be given undue weight or emphasis. (See *People v. Krueger* (1980), 82 Ill. 2d 305, 311, 412 N.E.2d 537.) The emphasis should be on the import of the words used. See *White v. Finkbeiner* (7th Cir. 1979), 611 F.2d 186, 190.

Here, the statement made by defendant is very similar to that made by the defendant in *Krueger*. We find that, under *Krueger*, a more definite invocation of the right to counsel should have been made in the instant case to effectively invoke the right to counsel. It follows that the subsequent confessions were not elicited by interrogators in violation of defendant's right to counsel.

Defendant's third contention concerns the State's use of its peremptory challenges in jury selection. Defendant, a black man, contends that the State used its peremptory challenges to exclude black jurors solely because of their race thereby denying him his sixth amendment right to have the jury drawn from a fair cross-section of the community.

■ In both *People v. Williams* (1983), 97 Ill. 2d 252, 454 N.E.2d 220, and *People v. Davis* (1983), 95 Ill. 2d 1, 447 N.E.2d 353, our supreme court rejected the precise issue raised by defendant here. Defendant attempts to distinguish *Davis* by pointing out that in that case, the State excluded only three blacks from an unspecified number of potential black jurors whereas in the instant case, the State peremptorily excluded all five potential black jurors. But the standard of proof which a defendant must meet in establishing a discriminatory exclusion of potential black jurors is a systematic exclusion in case after case, not from any particular jury. (See *People v. Williams* (1983), 97 Ill. 2d 252, 274, 278; *People v. Davis* (1983), 95 Ill. 2d 1, 16.) It is defendant who bears the burden of producing some evidence establishing a systematic exclusion (*People v. Davis* (1983), 95 Ill. 2d 1, 16), and we find that he has not met that burden here.

Defendant also cites the United States Supreme Court's recent denial of *certiorari* in *McCray v. New York* (1983), 461 U.S. 961, 77 L. Ed. 2d 1322, 103 S. Ct. 2438, as a ground for urging this court to reevaluate this State's stance on the peremptory challenge issue raised here. The Supreme Court, after acknowledging the importance of this issue, denied *certiorari* to allow the States to study the issue further. In light of the court's pronouncement, defendant urges this court to give the issue further consideration. This issue has, however, received extensive consideration in this State, and we elect not to address the issue further.

Defendant's next contention concerns the trial court's refusal to ask prospective jurors, during *voir dire*, whether they would be able to follow the law of self-defense. Defendant contends that the court's failure to ask this question, tendered by defendant, served to deny him a fair and impartial jury.

■■ ■ The questions to be asked of prospective jurors during *voir dire* are largely a matter within the trial court's discretion. (See *People v. Phillips* (1981), 99 Ill. App. 3d 362, 367, 425 N.E.2d 1040; *People v. Witted* (1979), 79 Ill. App. 3d 156, 164, 398 N.E.2d 68.) Where proposed questions touch upon "matters of law or instructions," however, they are prohibited by rule. (87 Ill. 2d R. 234.) We have previously held that where a proposed question addresses an affirmative defense to be raised in the case, it should be excluded under Supreme Court Rule 234. (See *People v. Phillips* (1981), 99 Ill. App. 3d 362, 369, 425 N.E.2d 1040 (compulsion); *People v. Witted* (1979), 79 Ill. App. 3d 156, 164-65, 398 N.E.2d 68 (mistaken identity); see also *People v. Byer* (1979), 75 Ill. App. 3d 658, 670, 394 N.E.2d 632 (compulsion).) Allowing such a question to be posited would convert *voir dire*

into "a vehicle for pre-educating and indoctrinating prospective jurors as to a particular theory or defense or impanelling a jury with particular predispositions." (*People v. Phillips* (1981), 99 Ill. App. 3d 362, 369.) Questions to prospective jurors regarding affirmative defenses are appropriate only when the defense is extremely controversial in nature. (See *People v. Witted* (1979), 79 Ill. App. 3d 156, 164, 398 N.E.2d 68 (insanity defense).) Self-defense does not qualify as controversial, and we find that the trial court did not abuse its discretion by refusing to ask defendant's proposed question.

Defendant's final contention is that the sentence of 35 years' imprisonment is excessive in that it fails to take into consideration the rehabilitative potential of the defendant, who was 17 years old at the time of the crime. Because of our finding that judgment should have been entered on only the voluntary manslaughter verdict, it will be necessary to remand this matter for resentencing. We need not, therefore, address the sentencing issue raised by defendant.

For the reasons expressed herein, we reverse the conviction for murder and remand to the trial court with directions to enter judgment on the voluntary manslaughter verdict. Accordingly, defendant must be resentenced. In all other respects, the judgment of the circuit court is affirmed.

Affirmed in part and reversed in part and remanded with directions.

HARTMAN, P.J., and DOWNING, J., concur.