728 P.2d 283

**STATE of Arizona, Appellee,**

v.

**Catherine R. INMAN, Appellant.**

**No. 1 CA–CR 8765.**

Court of Appeals of Arizona, Division 1, Department A.

April 29, 1986.

Reconsideration Denied July 3, 1986.

**414**

Robert K. Corbin, Atty. Gen. by William J. Schafer III, Chief Counsel, Criminal Div., Georgia B. Ellexson, Asst. Atty. Gen., Phoenix, for appellee.

J. Douglas McVay, Phoenix, for appellant.

KLEINSCHMIDT, Judge.

Catherine Inman was convicted of three counts of child abuse. On appeal she claims that certain incriminating statements she made to the police were improperly admitted in evidence because the police did not honor her request for an attorney. We affirm because we believe that the appellant, after inquiring when an attorney would be appointed for her, waived her right to counsel by initiating further discussion with the police.

Shortly after the appellant and her five-year-old son began living with one Alan Thompson the boy suffered a series of injuries culminating in severe brain damage. Evidence showed that Thompson beat and

strangled the boy and that the appellant did nothing to stop the abuse, nor did she seek help for the child until he was near death. Thompson was arrested and ultimately convicted separately of child abuse and attempted murder.

A day after Thompson was arrested appellant appeared at the police station in response to instructions from Robert E. Mills, a Phoenix police officer. Mills arrested the appellant and read her the *Miranda* warnings. When Inman said she did not understand the warnings, Mills read them to her again, emphasizing the right to remain silent. After the second reading, Inman told Mills that she understood her rights. She asked questions concerning the charges against her and at some point made an inquiry concerning a lawyer. For the sake of precision we quote from a part of the transcript of the voluntariness hearing:

Q [Prosecutor]: Did you then explain again anything to her about her options?

A [Mills]: Yes. I indicated that it was her option to speak with me if she wanted to.

Q And did she say anything to that?

A I believe she asked *whether* a lawyer would be appointed for her, if I recall correctly.

Q And did you give her a response to that question?

A Yes, I did.

Q What did you tell her?

A I believe that was also—if I'm correct, I believe that was also coupled with another request reference to the charge.

Q All right. When she said—did she ask you *whether* a lawyer would be appointed?

A Yes.

Q Did you give her an answer to that question?

A I believe I did. I'd like to look at that—my rendition of the interview as I have it in the copy of the report in front of me.

Q That would refresh your recollection?

A Yes, it would.

Q Take a look ... Does that refresh your recollection?

A Yes.

Q All right. After explaining to Mrs. Inman the charge, did you then tell her that she had the option not to speak with you if she so desired?

A That's correct.

Q Now, has your recollection been refreshed as to what you told her when she asked you about *whether* a lawyer could be appointed?

A Yes.

Q What did you tell her?

A That she could have one prior to any questioning.

Q What did she say after you told her that she could have a lawyer prior to questioning?

A We continued to discuss the matter at hand. (Emphasis supplied).

On cross-examination at the same hearing, Mills testified:

Q [Defense Attorney]: [S]he did question you concerning *when* she would receive a lawyer, is that correct?

A [Mills]: That's correct.

Q Did you ever obtain a lawyer for her?

A No, I did not.

Q And then she asked you to explain to her what the charge was, is that correct?

A That's correct.

Q Did you explain to her what the charge was?

A Yes, that it was, in fact, child abuse.

Q After you explained to her the charge, what happened next?

A I believe I explained the charge to her, and that's when she asked *when* did she get the attorney, as I recall.

Q And what did you tell her then?

A That she could have one prior to— prior to any questioning taking place.

Q And what did she respond to that?

A That—she went on about—more in-depth questioning about what the charge was and how she would be charged.

Q But at no time was she ever provided an attorney, is that correct?

A That's correct.

**416**

(Emphasis supplied).

On redirect examination, Mills testified:

Q [Prosecutor]: Did she ever ask for an attorney or did she just say, '*When* can I get one?'

A [Mills]: She asked *when* she could get one and not, 'I want one now.'

Q You told her *when* she could get one, which was anytime she wanted to?

A That's correct, prior to any questions taking place.

(Emphasis supplied).

Testimony developed later at the trial makes it clear that the in-depth discussion of the charges led to further questioning by the detective. The further questioning culminated in incriminating statements.

 If a defendant indicates in any manner that he or she wishes to consult with an attorney before speaking to the police during a custodial interrogation, all questioning must cease until an attorney is present. *Miranda v. Arizona,* 384 U.S. 436, 473–74, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694, 723 (1966); *State v. Emery,* 131 Ariz. 493, 497, 642 P.2d 838, 842 (1982). The police may not subvert *Miranda* by reinitiating interrogation once the right to counsel has been invoked, even if the *Miranda* warnings are repeated and the defendant thereafter agrees to waive his or her rights. *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378, 386, (1981); *State v. Finehout,* 136 Ariz. 226, 231, 665 P.2d 570, 575 (1983). If the suspect wishes to initiate additional discussion after invoking his right to counsel, his statements are admissible, *Edwards,* 451 U.S. at 485, 101 S.Ct. at 1885, 68 L.Ed.2d at 386; *State v. James,* 141 Ariz. 141, 144, 685 P.2d 1293, 1296 (1984), but only if the state shows by a preponderance of the evidence that the suspect initiated dialogue with the authorities. *Oregon v. Bradshaw,* 462 U.S. 1039, 1044, 103 S.Ct. 2830, 2834, 77 L.Ed.2d 405, 412 (1983). *See also Finehout,* 136 Ariz. at 231, 665 P.2d at 575.

 The state suggests that the appellant never requested counsel. The request need not be in any particular words as long as the sense of what is said conveys the request. *See People v. Fish,* 660 P.2d 505, 509 (Colo.1983). Cases from around the country reveal little consistency as to what is considered an invocation of the right to counsel. For instance, the statement "I think I need an attorney" or "Maybe I should see an attorney" has been held both to be invocation of the right to counsel, *People v. Cook,* 665 P.2d 640, 643 (Colo. App.1983); *Wentela v. State,* 95 Wis.2d 283, 292, 290 N.W.2d 312, 316 (1980), and insufficient to invoke the right to counsel, *Cannady v. State,* 427 So.2d 723, 728 (Fla. 1983); *People v. Kendricks,* 121 Ill.App.3d 442, 447, 77 Ill.Dec. 41, 44–45, 459 N.E.2d 1137, 1140–41 (1984). In the one case we have been able to find in which the accused asked "When can I get a lawyer," *People v. Harris,* 191 Colo. 234, 552 P.2d 10 (1976), the court held that such a statement was a request for counsel, and that all interrogation should have ceased at that point. The court held that it is not necessary for an accused, especially one inexperienced in answering police interrogation, to "demand" counsel. It was enough that the police officers were placed on notice that the defendant intended to exercise his constitutional rights. *Harris,* 191 Colo. at 236–37, 552 P.2d at 12. At very least Inman's question was an ambiguous request for counsel that, without more, should have stopped all questioning except that which would have been necessary to clarify whether she wanted a lawyer before questioning. *See United States v. Fouche,* 776 F.2d 1398, 1405 (9th Cir.1985) and *United States v. Cherry,* 733 F.2d 1124, 1130–31 (5th Cir.1984), and *compare State v. Finehout.*

 The more difficult issue in this case arises out of the fact that as soon as the defendant was told she could have counsel before questioning proceeded she initiated a further discussion of the case by making further inquiries about the charges against her. The question as to whether this amounts to a waiver of counsel is addressed in *Oregon v. Bradshaw,* 462 U.S.

1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983). In *Bradshaw,* the defendant, who had been driving a truck involved in a fatal crash, denied under police questioning that he had been driving. He stated that he wanted a lawyer and the police stopped questioning him. The defendant was then transported from the police station to the county jail and enroute, inquired of a police officer "Well, what is going to happen to me now?" The officer reminded the defendant that he had requested an attorney and told him he did not have to talk unless he wanted to. The defendant then asked where he was being taken and what he would be charged with. During the ensuing discussion the officer suggested that the defendant might take a lie detector test. The defendant did take a lie detector test which ultimately led to his confession. The Supreme Court, in a plurality opinion, held that the defendant, in asking the officer about what would happen, evinced a willingness to enter into a generalized discussion about the investigation. The court then went on to inquire as to whether, as required by *Johnson v. Zerbst,* 304 U.S. 548, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), the accused made a knowing and intelligent waiver of his right to counsel. The court concluded, under all the circumstances of that case, that he did.

While what happened here is not very different from what happened in *Oregon v. Bradshaw,* there is a feature of this case that requires further consideration. Here, the appellant's question about the charges against her followed immediately on the heels of the policeman's answer to her question about when she could have an attorney. There was no break in the proceedings. The argument might be made that had the policeman tried to clarify whether the appellant was requesting counsel, she would not have continued her dialogue. Indeed, our supreme court in *Finehout,* in reversing a conviction because the police had not honored a request for counsel, attached some significance to the fact that there was no break in the interrogation between the time the request was made and the time the defendant suppos-

edly reopened the dialogue. We do not consider *Finehout* controlling on this point because the supreme court recognized that in that case, as the officers were supposedly breaking off questioning, they used an acknowledged interrogation technique, saying "it's better just to be honest and tell the truth."

In this case there is not the barest suggestion from the record that the appellant was confused, that she wanted counsel when she asked the question, or that she felt a request for counsel would not be honored. It was not necessary for the policeman to refuse to engage in a dialogue *initiated by the appellant* so that the policeman could clarify an ambiguous request when the appellant had just been clearly told that she did not have to answer questions without counsel present. We find no case that goes that far. It is entirely plausible that the appellant completely understood she could have an attorney before proceeding further and made a conscious decision to talk about the case. The state therefore carried its burden of proof. A finding to that effect is implicit in the trial judge's ruling.

Appellant also contends the prosecutor made improper statements in his closing remarks. We note that the complained of remarks were not objected to at trial, and therefore any claim of error is waived. Furthermore, we have examined the remarks in their context and find that they were not prejudicial or improper.

For the foregoing reasons, appellant's conviction and sentence are affirmed.

GREER and MEYERSON, JJ., concur.