778 P.2d 1179

**The STATE of Arizona, Appellee,**

v.

**Raymond FLOWER, Appellant.**

**No. CR–87–0072–AP.**

Supreme Court of Arizona,
En Banc.

May 30, 1989.

Robert K. Corbin, Atty. Gen. by Jessica Gifford Funkhouser, Phoenix, and Eric J. Olsson, Asst. Attys. Gen., Tucson, for appellee.

Harold L. Higgins, Jr., Pima County Public Defender by Donald Klein, Rebecca A. McLean and Frank P. Leto, Deputy Pima County Public Defenders, Tucson, for appellant.

LACAGNINA, Judge.

## JURISDICTION

Raymond Flower was convicted of first-degree murder and armed robbery, with prior convictions and a finding that the offenses were committed while he was on parole. The court sentenced Flower to consecutive life sentences. Flower appeals from these convictions and sentences. This court has jurisdiction pursuant to A.R.S. § 13–4031.

## ISSUES

Flower raises the following issues on appeal:

1. The court's admission of portions of Flower's statement made to Detective Lowe violated Flower's fifth amendment right against self-incrimination because his right to silence was not honored and because the prosecutor did not disclose his intent to use the statement until after the trial had begun.

2. The court's admission of Lacy Riddell's taped statement made to Detective Lowe incriminating Flower denied him a fair trial because Riddell's statement was inherently unreliable.

3. The court's failure to give a sua sponte instruction on lesser-included offenses denied Flower a fair trial.

## FACTS

The victim, Tom Daniels, a 75–year–old caucasian, was nicknamed the "Car Wash Man" because he was the maintenance man

at the car wash located next to his house and he also made change in quarters for the customers. On March 29, 1986, the day he was killed, he was last seen walking toward his house at about 4:30 p.m. A neighbor discovered his body at about 6:30 p.m. on his bedroom floor and found water running in the kitchen sink. The medical examiner determined that the cause of death was from multiple stab wounds that penetrated his heart and left lung. Prior to his death, he was also severely beaten on the head, and there were stab wounds and bruises on his arms, legs and head, including some defensive injuries. The medical examiner determined the time of death as sometime between 3:00 p.m. and 6:00 p.m. that day.

Samples of blood, observed throughout the victim's house, were taken from the hallway, bathroom, bedroom, kitchen and sidewalk. Admitted pursuant to stipulation, the analysis of these blood samples revealed one of the following results: 1) inconclusive, 2) consistent with the blood of the victim, or 3) the blood could not have come from Flower, whose blood type is different than that of the victim. Human hairs were also discovered on the victim's hand and on his shirt. None of the hairs collected by the medical examiner exhibited Negroid hair characteristics. Flower is a black man. A single black hair was found on the victim's hand. Brown caucasian head hairs were also found, unlike the victim's head hair. The white and gray hairs found on the victim could not be microscopically analyzed because they have no pigment. However, samples of gray or white hairs taken from both the victim and Flower did not match these samples. Tissue scrapings were removed from underneath the victim's fingernails which could not be analyzed. Of the items dusted for fingerprints, only one print could be lifted; it was found not to have been made by either the victim or Flower. The murder weapon was never recovered. Flower's clothes and shoes were examined for blood. The results of that examination were not introduced at trial.

There was no testimony placing Flower at the victim's house near the time of the murder. One witness, Lloyd Lee Gainous, testified that he gave Flower a ride home from the Ponderosa bar the afternoon of the murder. The bar is located near the victim's house. Gainous also testified that while walking to the car with Flower he noticed that Flower's hand looked "nasty," as if it had dye on it. Flower had explained to Gainous that he had had a fight with his "old lady." Gainous also testified that as they were leaving the parking lot, his car ran over something. Flower said, "Hold it, you ran over my gun. Let me get my gun." Flower got the rifle, they left, went to one house where Flower knocked and got no response, then went on to a boarding house, where Flower sold the rifle to Ed Maxwell.

Lacy Riddell, an acquaintance of Flower's, gave a taped statement to Detective Perry Lowe eight days after the murder, following Riddell's arrest for burglary, sexual assault and aggravated assault of a 97–year-old woman. Detective Lowe made it clear at the beginning of the interview, in response to Riddell's immediate request for a lawyer, that he was not there to make any deals, that the other police officer on Riddell's case did not want to deal, and that Detective Lowe did not know if Riddell was going to do him any good or not. Detective Lowe stated: "So you convince me so I can convince him. Cause I don't wanna deal. I wanna find out what the heck you've got to say, if it's worth it, I'll turn everything over to the County Attorney. So if you wanna talk to me, you make it worth my while." Riddell immediately gave Detective Lowe a specific statement concerning the murder, implicating Flower as the sole participant.

Following Riddell's statement, Lowe searched Riddell's boarding house room and that of Ed Maxwell, where he seized a .22 rifle. In Riddell's room, he seized a baseball cap, a stain on which was analyzed and found to be perspiration from a person with type B blood who is also a secretor. Flower is a type B secretor. Lacy Riddell is a type O non-secretor. Flower was connected to the rifle and the cap through information provided by Riddell.

Riddell's statement to Detective Lowe was critical to the state's case. It is only through Riddell's taped statement, which was read to the jury, that Flower was connected directly to the murder. Riddell told Detective Lowe that Flower came to him a week after the murder carrying eight dollars in quarters, threw them on the bed, and told Riddell how he had sold the victim a rifle, then returned to the victim's house, telling him he had two more pistols so that the victim would go get some money. According to Riddell, when the victim came back without any money, the two fought, and Flower killed him. Riddell took the stand at trial but refused to testify concerning the statement, claiming his fifth amendment privilege against self-incrimination. The entire taped statement was played for the jury. In addition, a portion of Flower's statement to Detective Lowe was read to the jury, where Flower admitted he was at the bar having a fight with his girlfriend at about 6:00 p.m. on the night of the murder.

Flower was convicted of first-degree murder and armed robbery, both of a dangerous and repetitive nature, with a true finding as to the existence of prior convictions and that the offenses occurred while he was on parole. Following a presentence hearing, the trial court found beyond a reasonable doubt that Flower intended to kill the victim and that he had been previously convicted of a felony in the United States involving the use or threat of violence on another person. A.R.S. § 13–703(F)(2). In mitigation, the court found that Flower had a history of drug and alcohol abuse, that there was evidence at the trial that the killing occurred in the heat of an argument, and that the state acknowledged that this was not necessarily a proper case for imposition of the death penalty. Therefore, the court could not find beyond a reasonable doubt that the aggravating factors outweighed the mitigating factors and concluded that the death penalty was not appropriate. Flower was sentenced to consecutive life sentences without possibility of parole for 25 years.

## FLOWER'S STATEMENT TO DETECTIVE LOWE

The following statement made by Flower to Detective Lowe was read to the jury and admitted into evidence, over Flower's objections. The statement was made in response to a question by Detective Lowe, "What can you tell me about the old man down on 37th ... you had blood all over you. That's what Lloyd Lee says." Flower said, "Who?" and Detective Lowe responded:

Q LLOYD LEE

A Yeah, I told him what happened. I got in a fight with a chick out there.

Q OK, who were you fighting with?

A This girl from Phoenix, a prostitute.

Q What's her name?

A I don't know, man, they use so many names.

Q Where did you get in a fight with her?

A Right there in the parking lot.

Q In the parking lot of the Ponderosa?

A Yeah.

Q OK, what day was that?

A I think it was on a Friday or Saturday.

Q Saturday.

A Yeah, it could've been a Saturday.

Q What time did you get in a fight with her?

A Six in the evening, I don't have a watch, I can't tell the time.

Q About six in the evening?

A It was in the evening, I don't know exactly what time it was.

    \*    \*    \*    \*    \*    \*

Q What was her name?

A I know she was from Phoenix, man, you know, girls go by SHELLY(PH) different names, I don't know if that was her name.

Q OK. What did she look like?

A 5–5, brown skin complexion.

Q OK..

A I'm being charged with something, I have an attorney cause I ain't did

nothing, man, this is awfully serious. You know you accuse me of killing some guy I don't know about, you know. I haven't killed anyone, them are serious charges.

Q Yeah they are serious charges.

A Yes, they are. I haven't did anything. Maybe mistaken identity or something. I ain't killed nobody. No one have I killed.

Q Well ...

A What I want to kill somebody for?

Flower first argues that the statement was inadmissible because it was obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He contends that his silence following Lowe's recitation of the *Miranda* warnings at the arrest scene was an exercise of his right to silence and that Lowe did not "scrupulously honor" that right. *Michigan v. Mosley,* 423 U.S. 96, 101–103, 96 S.Ct. 321, 325–326, 46 L.Ed.2d 313 (1975). The record [1] shows that Lowe gave Flower the *Miranda* warnings at his arrest, approximately 15 minutes before the taped interview at the police station. At the suppression hearing, Lowe testified that he did not specifically ask Flower at the time of his arrest whether he wished to "waive" his *Miranda* rights, but instead asked if Flower wanted to answer his questions. The record is unclear whether Lowe asked Flower if he understood his rights. After being given the warnings, Flower said nothing. Lowe then asked Flower for his name. Before beginning the taped interview at the police station, Lowe did not readvise Flower of his *Miranda* rights, nor did he ask Flower if he understood his rights or wished to waive them.[2]

■ Lowe's interrogation of Flower at the police station [3] was a violation of Flower's fifth amendment right to silence. Flower's silence, after being advised of his rights and asked if he wanted to answer questions, created an ambiguity as to whether Flower was actually invoking his right to silence. It is not clear that Flower in fact understood and waived his rights. He remained silent, there was a 15– or 20–minute delay between the warnings and the interrogation, and Lowe did not readvise Flower of his *Miranda* rights. Under these facts, Flower's silence was at best ambiguous.

In the face of this ambiguity, Lowe's clear duty was either to cease all interrogation or to clarify whether Flower was exercising his right to silence. *Christopher v. Florida,* 824 F.2d 836, 841 (11th Cir.1987), *cert. denied,* 484 U.S. 1077, 108 S.Ct. 1057, 98 L.Ed.2d 1019 (1988) (after an equivocal invocation of the right to silence, *Miranda* requires cessation of interrogation; only permissible questions were those for purposes of clarification); *State v. Finehout,* 136 Ariz. 226, 229, 665 P.2d 570, 573 (1983) (in the face of an equivocal assertion of right to silence, police questions are limited to clarifying suspect's intent). But Lowe did neither of these things. Instead, once at the police station, he immediately

---

**1.** For purposes of reviewing the admission of Flower's statement into evidence, we look only to the evidence presented to the trial court at the suppression hearing. *See State v. Lambright,* 138 Ariz. 63, 72, 673 P.2d 1, 10 (1983), *cert. denied,* 469 U.S. 892, 105 S.Ct. 267, 83 L.Ed.2d 203 (1984), and *State v. Arnett,* 119 Ariz. 38, 42, 579 P.2d 542, 546 (1978) (for purposes of reviewing trial court's determination of the voluntariness of a confession, appellate court looks only to evidence presented at the voluntariness hearing).

**2.** We do not hold that Lowe was obligated to readvise Flower of his *Miranda* rights. We only hold that in this case the lack of any repeated warnings contributes to the ambiguity inherent in Flower's silence. *Cf. State v. Prince,* 160 Ariz.

268, 772 P.2d 1121, 32 Ariz.Adv.Rep. 12 (April 6, 1989) (because defendant affirmatively indicated he understood his rights and answered questions immediately, no ambiguity arose requiring interrogating officer to clarify defendant's intent).

**3.** We do not decide if Lowe interrogated Flower within the meaning of *Miranda* when he asked Flower for his name at the arrest scene. *Cf. State v. Landrum,* 112 Ariz. 555, 559, 544 P.2d 664, 668 (1976) (asking for a suspect's name is not always an interrogation within the meaning of *Miranda* ); *United States v. Poole,* 794 F.2d 462, 467, *modified on other grounds,* 806 F.2d 853 (9th Cir.1986) (determination of whether asking a suspect for his name is an interrogation within the meaning of *Miranda* must be made on a case-by-case basis).

launched into his interrogation of Flower. Thus, we must hold that by failing to at least clarify Flower's intent, Lowe did not "scrupulously honor" Flower's right to silence, and the entire statement was inadmissible as a violation of *Miranda*. *Mosley*, 423 U.S. at 101–103, 96 S.Ct. at 325–326 (1975); *Christopher*, 824 F.2d at 841; *Finehout*, 136 Ariz. at 229, 665 P.2d at 573. Moreover, Lowe's violation of Flower's right to remain silent is not vitiated by Flower's answers to Lowe's unlawful questioning. *Christopher*, 824 F.2d at 841.

Furthermore, there is no evidence that Flower waived his right to silence by initiating any conversations with the police. *See State v. Inman*, 151 Ariz. 413, 416, 728 P.2d 283, 286 (App.1986). Flower's answers to unlawful police-initiated questions cannot be construed as a waiver of his *Miranda* rights. *Christopher*, 824 F.2d at 844–845. Accordingly, Flower's entire taped statement must be suppressed as violative of his right to silence.

■ The state concedes that Lowe violated Flower's right to counsel. At the suppression hearing, defense counsel produced a statement by Lowe made in an interview with defense counsel. In that interview, Lowe stated that he had "no doubt" that Flower had asked for an attorney early on during Lowe's interrogation of Flower. In addition, Detective Lowe admitted at the suppression hearing that when he listened to the tape of his interview with Flower, he heard the words, "can I have an attorney" and further admitted that that was "the way it came out to [Lowe] at that time." Yet Lowe also admitted that he had continued to interrogate Flower despite his request for counsel. Thus, Lowe clearly violated Flower's *Miranda* rights by not ceasing the interview and acting on Flower's request for an attorney.[4]

■ We also agree with Flower's argument that the state did not satisfy its dis-

closure obligations under Ariz. R. Crim. P. 15, 17 A.R.S., concerning Flower's statement. The prosecutor has a duty to disclose to the defendant which, if any, of the defendant's statements will be used in the state's case in chief. *State v. Alvarado*, 121 Ariz. 485, 488, 591 P.2d 973, 976 (1979). The record shows that following Flower's motion to suppress, based upon *Miranda* and *Edwards*[5] violations, the state admitted the violations and argued that the statement could be used for impeachment purposes only, should Flower take the stand. Flower's entire defense centered on eliciting testimony from Gainous, Maxwell and others that Flower had indeed left the bar with Gainous around 3:00 p.m. the day of the murder. The prejudice to Flower's case was obvious. It sabotaged his defense, and the statement was relied on extensively by the prosecutor in closing argument.

The prosecutor *never* stated any different intention concerning the use of the statements until after Detective Lowe took the stand on the third day of trial. At that point, the following bench conference took place:

[THE COURT:] Who's [sic] tape recorded statement is that?

MR. LESSLER: Flower, before he asked for an attorney.

THE COURT: That's not my ruling.

MR. LESSLER: It's hearsay, it's non-hearsay, it's a party admission, it's voluntarily given after it was given, and you ruled that it was voluntary.

THE COURT: You are talking about the same motion that I ruled on in November, the same statement?

MR. LESSLER: Yes.

THE COURT: Although taken in violation of his constitutional rights, it's admissible for purposes of impeachment on cross-examination.

MR. LESSLER: And—

**4.** Detective Lowe's violation of *Miranda* and the fifth amendment in this case is virtually identical to his documented violation in another recent case, *State v. Bravo*, 158 Ariz. 364, 762 P.2d 1318 (1988) *cert. denied*, —— U.S. ——, 109 S.Ct. 1942, 104 L.Ed.2d 413 (1989). In *Bravo*, we

were also required to reverse a murder conviction because of Lowe's constitutional violations.

**5.** *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1979).

THE COURT: My minute entry specifically limits it for impeachment purposes only.

MR. LESSLER: Judge, my response—

THE COURT: I'll read my minute entry. Just a second.

Your response reads as follows, just so we are clear and we are on the record.

MR. LESSLER: My response—

THE COURT: I would like to complete the sentence before I am interrupted.

Defendant's statements concerning, among other things, the eight dollars worth of quarters, the victim's revolver sold by the defendant and the Southwest Gas cap and the defendant's cut hand are all relevant to the case at bar. Should the defendant take the stand and testify that he has no knowledge about any of the above, the State would be within the proper bounds of proper cross-examination of impeaching the defendant with his previous statements. The State reserves the right to impeach the defendant for impeachment purposes.

MR. LESSLER: That's correct, Your Honor.

THE COURT: My minute entry ruling gave additional time for briefing, was argued on November 24th, and I heard Detective Lowe testify. I heard your arguments, I listened to the tape and my under advisement ruling was made on the 26th.

It is ordered that the motion is denied and the statements may be made for impeachment purposes.

MR. LESSLER: And the statements referred to by the court in quoting my response referred to everything except for statements made by the defendant before he invoked his right to an attorney, and those statements concern his being in the Ponderosa parking lot at 6:00 in the evening. And we don't quote that as part of the violations that we reserve the right on for impeachment.

The state's rather oblique inference by omission to all Flower's statements made prior to his invocation of right to counsel, as stated above, is insufficient disclosure to satisfy the requirements of Rule 15. As the trial court later stated, the prosecutor never argued that such statements should be admissible. Nowhere in the record, except for this reference, is there any indication that the state intended to use the statement in its case in chief. Moreover, it was not mentioned in opening statement. The defense could not be charged with the assumption that the statement would be used where the trial judge herself was completely amazed, surprised and displeased by it. In addition, the state's initial disclosure of its intent to use Flower's statement, prior to any pretrial rulings concerning *Miranda* and *Edwards* violations, does not put the defense on notice concerning subsequent intent to use the statement. Flower was not required to further request disclosure following the trial court's ruling excluding the statement in the state's case in chief. *See* Ariz.R.Crim.P. 15.6, comment, 17 A.R.S.

The trial court never ruled on the disclosure issue, but did allow the statement into evidence under Ariz.R.Evid. 801(d)(2), 17A A.R.S., as an admission by a party opponent. Although we find a violation of Rule 15, the trial court need not rely on that upon retrial in light of our conclusion that the entire statement is inadmissible as a violation of Flower's fifth amendment rights.

### LACY RIDDELL'S STATEMENT

In light of our decision granting Flower a new trial based upon the erroneous admission of his statements made to Detective Lowe, we need not decide the issue of the trial court's admission of Lacy Riddell's taped statement. Although we acknowledge there are significant problems with the admissibility of the statement, we are unable to determine what those problems are, or whether the statement is inadmissible in whole or in part because neither counsel nor the trial judge made a clear record.

Flower also argues that he was entitled to sua sponte instructions on lesser-included offenses of second-degree murder and manslaughter. However, the evidence supporting these instructions comes from Rid-

dell's taped statement to Detective Lowe. Therefore, the giving of these instructions depends upon the admissibility of this statement upon retrial.

Flower is granted a new trial in this case. The convictions are reversed, the sentence is vacated, and the case is remanded for proceedings consistent with this opinion.

GORDON, C.J., FELDMAN, V.C.J., and CAMERON and MOELLER, JJ., concur.

Justice WILLIAM A. HOLOHAN did not participate in this decision; pursuant to Ariz.Const. art. 6, § 3, Judge MICHAEL A. LACAGNINA, Court of Appeals, Division Two, was designated to sit in his stead.